IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

DUBLIN DIVISION

| | | |
|---|---|---|
| RICKY LEWIS WILSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CV 316-040 |
| | ) | |
| WILLIAM DANFORTH, Former Warden; | ) | |
| FRED GAMMAGE, Deputy Warden of | ) | |
| Security, Telfair State Prison; ROBERT | ) | |
| TOOLE, Field Operations Officer, Georgia | ) | |
| Department of Corrections; TERENCE | ) | |
| KILPATRICK, Unit Manager, Telfair | ) | |
| State Prison; ZACHARY MIXON, | ) | |
| Sergeant of CERT Team, Telfair State | ) | |
| Prison; PHILLIP HALL, Warden; and | ) | |
| RODNEY MCCLOUD, Unit Manager, | ) | |
| | ) | |
| Defendants. | ) | |

---

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

---

Plaintiff, an inmate at Smith State Prison ("SSP") in Glennville, Georgia, is proceeding *pro se* and *in forma pauperis* ("IFP") in this civil rights case pursuant to 42 U.S.C. § 1983 regarding events alleged to have occurred at Telfair State Prison ("TSP") in Helena, Georgia. The Court **REPORTS** and **RECOMMENDS** Defendants' motion for summary judgment be **GRANTED**, (doc. no. 144), a final judgment be **ENTERED** in favor of Defendants, and this civil action be **CLOSED**.

I.    FACTS

A.    **Plaintiff's Evidence of Gang Violence at TSP**

The only claim remaining at summary judgment is Plaintiff's deliberate indifference to

safety claim against Defendants in their individual capacities, and at the core of this claim is Plaintiff's allegation TSP is rife with gang violence to such a degree that violence and terror reign.  (See doc. nos. 144, 166.)  Plaintiff was an inmate at TSP from May 2014 through November 2018.  (Stm. of Material Facts ("SMF"), doc. no. 144-2, Pl.'s Dep., doc. no. 144-3, p. 3; doc. no. 166-1, p. 12.)  Plaintiff denies being in a gang or classified as a gang member.  (Id. at 13.)

Plaintiff claims he suffered physical injuries in two gang-related altercations at TSP.  (Id. at 35-55, 107-108, 110-117; doc. nos. 22, 61, 66, 79, 163, 164.)  First, on either March 3, 2016, or September 17, 2016, gang members pushed Plaintiff down during a riot in his dorm.  (Doc. no. 164, pp. 2-3; Pl.'s Dep., pp. 35-39, 51-54, 107-08.)  The riot began after two Crip gang members stabbed a Blood gang member in the face.  (Pl.'s Dep., pp. 35-36.)  The inmate leader in the dorm, who was responsible for helping prison officials communicate with inmates, attempted to stop the stabbing.  (Id. at 36-37.)  Plaintiff attempted to leave the television area and get back to his cell, but he was pushed by a Crip gang member.  (Id. at 52.)  The gang member pushed Plaintiff because of the "way [he] was moving" trying to get back to his cell.  (Id. at 53.)  The push injured Plaintiff's back, but he did not seek medical attention for the injury.  (Id. at 53-54.)

Second, on May 10, 2017, Plaintiff was hit in the head by a lock thrown during a riot in his dorm.  (Doc. nos. 61, 66, 79, 163; Pl.'s Dep., pp. 72-73, 110-117.)  Plaintiff was in the television area when he saw gang members prepare to fight.  (Pl.'s Dep., p. 112.)  Several gangs were involved, and Plaintiff didn't have anywhere to go.  (Id. at 112-13.)  Plaintiff was suddenly hit in the back of the head, so he ran to his cell.  (Id. at 113.)  Plaintiff had no time to react before

he was hit.  (Id. at 114.)  Plaintiff bled from the site of the injury for several days and for an

unspecified duration experienced severe headaches and blurry vision.  (Id. at 114-17.)  Plaintiff

was initially denied medical treatment but was later seen by medical staff.  (Id. at 72-73, 114-17.)

Plaintiff states he personally observed four additional incidents of gang-related violence

at TSP.  On March 25, 2016, there was a stabbing between members of rival gangs in Plaintiff's

dorm.  (Doc. no. 10, p. 4.)  On April 15, 2016, Plaintiff saw members of the Muslim and Gangsta

Disciple gangs stab each other outside of his cell window.  (Pl.'s Dep., pp. 75-76.)  On August 3,

2016, there was a riot between the Blood gang and Mexican gang in dorm C-1, where Plaintiff

was temporarily housed.  (Doc. no. 15, p. 2; Pl.'s Dep, pp. 102-107.)  Finally, on December 7,

2016, three gang members assaulted another inmate and forced him to move to another dorm.

(Doc. no. 40; Pl.'s Dep., pp. 108-109.)

Plaintiff described ten additional incidents of violence he did not observe.  On December

1, 2015, there was a "war" between rival gangs in dorm C-1.  (Doc. no. 10, p. 2; Pl.'s Dep., pp.

22-23.)  On December 2, 2015, members of the Blood gang beat a member of the Crip gang in

dorm A-2.  (Pl.'s Dep., pp. 23-24.)  On March 5, 2016, a member of the Crip gang stabbed a

member of the blood gang in dorm B-1.  (Pl.'s Dep., pp. 51; doc. no. 38, p. 12.)  On March 15,

2016, a civilian inmate was beaten and robbed in dorm D.  (Pl.'s Dep., pp. 73-75.)  Plaintiff did

not know the inmate's name or how badly he was hurt and did not speak with him about the

incident.  (Id.)

On March 18, 2016, a member of the Blood gang beat another member of the gang in

dorm C-1 and broke his jaw.  (Id. at 66.)  On June 8, 2016, a member of the Aryan gang beat

another member of the same gang.  (Doc. no. 10, p. 4.)  On June 10, 2016, there were multiple

stabbings in dorms B and C.  (Doc. no. 99, p. 2.)  On June 20, 2016, there were stabbings between gang members in dorms D-1 and C-2.  (Doc. no. 10, p. 4.)  In October 2016, there was a stabbing between members of gangs in lockdown in segregation dorm D-2.  (Doc. no. 36, p. 2; doc. no. 39, p. 3.)  Finally, on December 2, 2016, an inmate gang member was assaulted after being moved to dorm H-1.  (Doc. no. 39, p. 3.)

Plaintiff further describes seven specific incidents he believes show Defendants granted gang members authority to control discipline and classification at TSP.  On December 3, 2015, Officers Kilpatrick and Mixon brought two gang leaders into B-2 during a lockdown and allowed the gang leaders to instruct and encourage other gang members to retaliate against previous violence once the lockdown was lifted.  (Doc. no. 164, p. 2; Pl.'s Dep., pp. 25-32.)  Officers Mixon and Kilpatrick followed the gang leaders as they instructed their members, but the gang leaders did not stop to talk to Plaintiff or his cellmate.  (Pl.'s Dep., pp. 31-33.)  On January 27, 2016, prison officials watched gangs gather outside the gym, while the gang leaders informed the members of an ongoing issue with an opposing gang.  (Id. at 33-34.)  Plaintiff states such "forming and gathering" is against GDC policy.  (Id. at 33.)

On March 5, 2016, members of the Blood gang retaliated against members of the Crip gang by moving them out of G and H dorms.  (Id. at 55.)  Gang members made the decision to move the Crip gang members, and prison administration, including Officers Hall, Gammage, and Tool, moved the Crip gang members to the gym with their property and later moved them to dorm E.  (Id. at 57-62.)  On March 9, 2016, Officers McCloud and Hall informed inmates in dorm B-2 they put leaders in the dorm and need them to lead.  (Doc. nos. 43, 146, 164; Pl.'s Dep., pp. 62-65.)  Warden Hall informed the inmates they were to go to their leaders if there is a

problem and the leader will notify prison officials.  (Id.) The speech was recorded on a laptop. (Id. at 64.)  Prison officials Barbara Grant Cathy Lewis, and William Sike were also present.  (Id. at 63-64.)

On June 10, 2016, prison officials allowed members of the Gangsta Disciples gang to gather during yard call.  (Doc. no. 10, p. 4.)  On August 4, 2016, Director Toole admitted knowledge of gang operations in TSP and informed gang members and leaders they will not operate anymore in prisons.  (Doc. no. 15, p. 2; Pl.'s Dep. 102-104.)  Director Toole informed gang members they would not be able to operate as gangs anymore and would have to "find another way to do this."  (Id. at 103.)  On August 4, 2016, the Blood gang forced Mexican inmates to leave dorms G and H.  (Doc. no. 15, p. 2.)  Prison officials, including Officers Mixon and Hall, moved the Mexican inmates to the gym and then to dorm A-1 for housing.  (Id.)  On August 8, 2016, Officers Hutchinson, Clack, and Clemmons escorted three gang members to dorm B-2 and instructed members of the Blood gang all Mexican inmates would have to leave TSP but "white guys" in dorms G and H can stay.  (Doc. no. 14, p. 1; Pl.'s Dep., pp. 80-91.)  The Mexican inmates were not forced to leave TSP; prison administration moved them to the gym and then to other dorms.  (Pl.'s Dep., pp. 84-85.)  Finally, on December 12, 2016, three gang members told Plaintiff they wanted his cell, so he moved out.  (Doc. no. 39, p. 2; doc. no. 40, p. 2.)  Officials watched this happen.  (Doc. no. 40, p. 2.)

By declaration, Trevio Head states he witnessed inmate-on-inmate violence on seventeen dates.  (Head Decl., doc. no. 4, p. 2.)  On March 9, 2016, prison officials stated they allow gang members to act as leaders and operate their own security in the dorms.  (Id. at 2-3.)  Prison officials give aid and comfort to gangs and do nothing to protect the safety of non-affiliated

inmates.  (Id. at 4.)

Jason Castro declared Officers Hall and McCloud approached him on several occasions asking him to become a leader in dorm A-1 and oversee members of the gangs. (Castro Decl., doc. no. 123, p. 1.)  In August 2018, Castro, Officers McCloud and Sike, and Warden Nathan Brooks discussed the killing of Daniel Martinez in dorm B-2.  (Id. at 2.) Unit Manager McCloud later came to his dorm and asked if he has control over his people. (Id.)  Castro is in danger because gang members consider him to be working with and informing prison officials because of the authority given to him.  (Id.)

## B.     Undisputed TSP Practices

### 1.     Inmate Housing and Classification Practices

TSP houses approximately 1,400 inmates.  (SMF, Hall Decl.[1], doc. no. 172-2, ¶ 5.)  TSP houses its inmates in one of eight buildings labeled A to H.  (Id. at ¶ 6.)  Buildings A to D are general population buildings containing two dorms within each building, eighty inmates per dorm, and individual cells within each dorm.  (Id.)  These buildings allow free movement within the dorm during the day, but inmates are locked in their cells at night.  (Id.)  At all times, inmates are restricted from moving to another dorm in the same building or another building by walls, fences, and physical barriers.  (Id.)  Correctional officers are posted to oversee each dorm.  (Id.) During yard call or chow time, each dorm travels together accompanied by correctional officers,

---

[1]On May 17, 2019, the Court ordered Defendants to file complete declarations of Defendants Danforth and Hall to correct incomplete declarations submitted with their summary judgment motion.  (Doc. no. 171.)  Defendants did so the same day and served a copy on Plaintiff by mail.  (Doc. no. 172.)  In a May 24, 2019 filing, Plaintiff complains he has been prejudiced by the omission because he did not have the complete declarations when responding to the summary judgment motion.  (Doc. no. 174, p. 1.)  However, Plaintiff does not allege what prejudice he suffered or how he would have responded differently if the complete declarations has been provided initially.  Furthermore, the supplemental material only concerns the dorm structure at TSP.  Accordingly, the Court considers the complete declarations herein.

and must go through metal detector checkpoints in groups of ten at a time.  (Id.)  This process is repeated when inmates return to their specified dorms.  (Id.)

Buildings E and F are known as tier or segregation dorms whereby inmates are placed in two or one-person cells and must be accompanied by a correctional officer every time they leave their cell.  (Id. at ¶ 7.)  The dorms of these buildings can house up to 280 inmates.  (Id.)  Inmates are placed in these buildings for either short or long periods of time because they committed disciplinary infractions, have violent histories, or are in protective custody.  (Id.)  Buildings G and H are general population, open buildings, containing four to five internal, separated dorms. (Id. at ¶ 8.)

Gangs, also referred to as "security threat groups" ("STG"), exist in every prison, but particularly so in close security prisons because gang membership increases the security level of an inmate.  (Id. at ¶ 9.)  Almost all STG inmates are classified as medium or close security.  (Id. at ¶ 10.)  Gang membership is impossible to prevent because it is personal, voluntary, and not publicly visible.  (Id. at ¶ 9.)  In addition to initial screening at the entry facility, TSP has an STG coordinator, usually a corrections officer, who is responsible for gathering information and screening inmates upon their entry into TSP by interviews and observations.  (Id. at ¶¶ 10, 11.) Through this process, inmates become validated STG members.  (Id. at ¶ 11.)  TSP continues to gather new information to determine changes in inmate affiliations, but given the subjective, non-public nature of gang affiliation, it is impossible to identify accurately all gang members at TSP.  (Id.)

Known gang members are housed with non-gang members to ensure there is not a high concentration of any one gang, or gang members generally, in any one dorm because high

concentrations of one gang or gang members increase the likelihood for violent altercations.  (Id. at ¶¶ 12-16.)  The majority of gang violence occurs because of animosity between rival gang members.  (Id. at ¶ 14.)  TSP spreads validated STG inmates from different gangs among the buildings and dorms to reduce the likelihood of violence.  (Id.)

### 2.    Security Measures at TSP

Inmate-on-inmate violence is prevalent in all prisons.  (Id. at ¶ 17.)  In addition to using metal detectors during mass movements of dorms, keeping informed of STG-related activity, and housing gang members strategically, TSP prison officials conduct meetings to discuss security issues, incidents of violence, and weapons and contraband discoveries.  (Id. at ¶¶ 20-21, 26.)  It is common practice for TSP officials to write incident and disciplinary reports when there are inmate assaults.  (Id. at ¶ 22.)  When gang-related activity and violence is observed, TSP officials make speeches informing inmates individually and dorm-wide that gang-related activity will not be tolerated.  (Id.)  To control the amount of contraband at TSP, officers perform shakedowns, or unannounced searches of inmates and their living spaces, to discover and confiscate weapons and other contraband.  (Id. at ¶ 23.)  Shakedowns occur at least once a month and possibly two to three times a week.  (Id.)  Additionally, inmates are searched based on tips or suspicion of contraband, and a specifically designated group of TSP officers, Correctional Emergency Response Team ("CERT"), gathers intelligence and searches for contraband.  (Id.)

Furthermore, the fence around the prison is painted orange and regularly monitored to discourage inmates from breaking off pieces to use as weapons.  (Id. at ¶ 24.)  Also, TSP officials implement lockdowns to diffuse and address incidents of violence involving multiple inmates.  (Id. at ¶ 27.)  Warden Hall increased the amount of yard time to allow inmates to

exercise and decrease the symptoms of physical aggression.   (Id. at ¶ 28.)   TSP hired a recreational director and two coaches to assist in increasing the effectiveness of yard time.  (Id.)

In the event an inmate complains of a specific threat from an identifiable source, TSP officials will attempt to mitigate the threat or offer the inmate protective custody.  (Id. at ¶ 29.) However, an inmate merely stating he feels unsafe with gang members is insufficient to warrant a housing change because gang members are present in all dorms.  (Id. at ¶ 30.)

### C.    Defendants' Occupations and Involvement in the Relevant Events

Defendant Robert Toole is GDC's Director of Field Operations and had held that title since May 30, 2018.  (SMF, Toole Decl., doc. no. 144-6, ¶ 2.)  Prior to May 30, 2018, he was Deputy Director of Field Operations and, prior to January 1, 2018, he served as Southeast Regional Director and Field Operations Manager for GDC.  (Toole Decl. at ¶¶ 2, 4.)  Most of his work is performed at GDC's headquarters and does not involve daily management of institutional-level security, housing, or classification.  (Id. at ¶¶ 3, 5-4.)  According to Plaintiff, Director Toole visited TSP in July 2016, following a lockdown and delivered a speech to the inmates advising them gang activity would "no longer be tolerated."  (Pl.'s Dep., p. 29, 102-03.) Director Toole does not recall this event but states it is possible he visited on that date and made a speech.  (Toole Decl., ¶ 10.)

Defendant Terence Kilpatrick is currently Warden of Smith State Prison in Glennville, Georgia.  (SMF, Kilpatrick Decl., doc. no. 144-9, ¶ 2.)  As Tier Unit Manager at TSP from February 2015 until February 2016, he oversaw administration of TSP's tier housing units.  (Id. at ¶¶ 3-5.)  He did not have the ability to control or modify the housing of any inmates who were

not being housed in tier segregation.  (Id.)  Further, he did not have the ability to control the overall housing scheme at TSP.  (Id. at ¶ 5.)

Zachary Mixon is currently a Sergeant at Treutlen Probation Detention Center in Soperton, Georgia, and has held that position since June 2016.  (SMF, Mixon Decl., doc. no. 144-10, ¶ 2.)  He was a correctional officer at TSP with the title of Sergeant from March 2014 until June 2016.  (Id. at ¶ 3.)  Sgt. Mixon did not have the ability to control or modify an inmate's housing or security classification.  (Id. at ¶¶ 4-5.)  Nor did he have the ability to modify the overall housing scheme at TSP.  (Id.)  Plaintiff testified he sued Officers Kilpatrick and Mixon merely because they escorted two inmates believed by Plaintiff to be gang members on December 3, 2015.  (Pl.'s Dep., pp. 122.)

Defendant William Danforth was employed as Assistant Regional Director for the Southwest GDC Region based in Leesburg, Georgia, from January 1, 2016, until his retirement on August 31, 2018.  (SMF, Danforth Decl., doc. no. 172-1, ¶ 2.)  TSP is not one of the nine prisons included in GDC's Southwest Region, and he had no knowledge or oversight of its daily operations.  (Id.)  From 2012 until January 2016, Defendant Danforth served as Warden at TSP.  (Id. at ¶ 3.)  Plaintiff testified he did not personally interact with Warden Danforth during that period.  (Pl.'s Dep., pp. 65-66.)

Defendant Phillip Hall has served as Warden of TSP from January 1, 2016, until July 1, 2018.  (Hall Decl., ¶ 2.)  He was responsible for and implemented the security measures described above.  (Id. at ¶ 3.)  Rodney McCloud is Deputy Warden of Security at TSP and has held that title since January 25, 2016.  (SMF, McCloud Decl., doc. no. 144-8, ¶ 2.)  Plaintiff sued

him because he was present for the March 2016 speech to Building B Dorm 2. (Pl.'s Dep., p. 122.)

Defendant Fred Gammage is Deputy Warden of Security at Autry State Prison ("ASP") in Pelham, Georgia, and has held that title since June 2017. (SMF, Gammage Decl., doc. no. 144-7, ¶ 2.) He was Deputy Warden of Security at TSP from January 2015 until June 2017. (Id.) Plaintiff sued him because he denied Plaintiff's grievance about gang members from HSP being present at TSP. (Pl.'s Dep., pp. 121-22.)

## II.    DISCUSSION

### A.    Summary Judgment Standard

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1244 (11th Cir. 2003) (citation omitted).

If the burden of proof at trial rests with the movant, to prevail at the summary judgment stage, the movant must show that, "on all the essential elements of its case . . . , no reasonable jury could find for the nonmoving party." United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1438 (11th Cir. 1991) (en banc). On the other hand, if the non-moving party has the burden of proof at trial, the movant may prevail at the summary judgment stage either by negating an essential element of the non-moving party's claim or by pointing to specific portions of the record that demonstrate the non-moving party's inability to meet its burden of proof at trial. Clark v. Coats & Clark, Inc., 929 F.2d 604, 606-08 (11th Cir. 1991)

11

(explaining <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144 (1970) and <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317 (1986)).

If the moving party carries the initial burden, then the burden shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." <u>Id.</u> at 608.  The non-moving party cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint.  <u>Morris v. Ross</u>, 663 F.2d 1032, 1034 (11th Cir. 1981).  Rather, the non-moving party must respond either by affidavits or as otherwise provided in Fed. R. Civ. P. 56.  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986) (quoting <u>Adickes</u>, 398 U.S. at 158-59).  A genuine dispute as to a material fact is said to exist "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Id.</u> at 248.

## B.    Factual Record

In response to Defendants' motion for summary judgment, Plaintiff filed a "Statement Opposing Defendants' Statement of Material Facts."   (<u>See</u> doc. no. 166-1, pp. 11-22.)  However, Plaintiff does not specifically contradict Defendants' factual assertions in his opposition.  Instead, Plaintiff discusses the necessity of a jury trial, his housing at TSP, why he sued each Defendant, and restates allegations consistent with his deposition testimony.  (<u>Id.</u>)  The only factual assertions Plaintiff explicitly disputes are Defendants' contentions:  (1) the safest housing strategy is to spread gang inmates among the dorms at TSP; (2) the security measures at TSP are adequate; and (3) officials address specific safety concerns once communicated by an inmate.  (<u>Id.</u> at 13, 15-19.)  However, Plaintiff cites no support adequate

to contradict these assertions.

Plaintiff also submitted twenty-two declarations signed by him consisting of legal argument, policy guidelines, and allegations of violent altercations at TSP.[2]   (See generally doc. nos. 10, 12-15, 22, 34, 36, 39, 40, 43, 58, 61, 66, 79, 99, 115, 146, 153, 159, 163, 164.) Plaintiff also submitted declarations by inmates Trevio Head and Jason Castro.  (Doc. nos. 4, 123.)

Because Plaintiff did not provide a statement of material facts directly refuting Defendants' statement of material facts, the Court deems admitted all portions of Defendants' Statement of Material Facts having evidentiary support in, and not otherwise contradicted by, the record.  See Loc. R. 56.1; Fed. R. Civ. P. 56(e); see also Williams v. Slack, 438 F. App'x 848, 849-50 (11th Cir. 2011) (finding no error in deeming defendants' material facts admitted where pro se prisoner failed to respond with specific citations to evidence and otherwise failed to state valid objections); Scoggins v. Arrow Trucking Co., 92 F. Supp. 2d 1372, 1373 n.1 (S.D. Ga. 2000) (same).

However, Defendants, as the movants, continue to "shoulder the initial burden of production in demonstrating the absence of any genuine issue of material fact."  Reese v. Herbert, 527 F.3d 1253, 1268 (11th Cir. 2008); see also Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1303 (11th Cir. 2009).  Thus, the Court will consider facts in the record outside of Defendants' statement of material facts, including Plaintiff's deposition and the declarations filed by Plaintiff, to the extent they meet the requirements of Federal Rule of Civil Procedure

---

[2]Several of Plaintiff's declarations are not relevant to his claim because they address his transfer to SSP and conditions at SSP or seek various relief from the Court.  (See doc. nos. 112, 129, 130, 133, 135, 139, 141, 147, 152, 157, 160, 165, 167.)

56, "to determine if there is, indeed, no genuine issue of material fact."  <u>Mann</u>, 588 F.3d at 1303.

### C.   Defendants Are Entitled to Summary Judgment Because TSP Is Not Exceedingly Violent

Defendants contend they are entitled to summary judgment because:  (1) Plaintiff was not subject to an objectively substantial risk of serious harm; (2) Defendants did not act with deliberate indifference to any substantial risk of serious harm; (3) Defendants are protected by qualified immunity; and (4) Plaintiff's claims for injunctive relief are moot to some Defendants and sweeping and intrusive to the other Defendants.   (<u>See</u> doc. no. 144-1.) Plaintiff contends Defendants are allowing gang leaders to control inmate security at TSP, are deliberately indifferent to rising gang violence, and have created "generalized conditions of dangerousness."  (<u>See</u> doc. no. 166.)  The Court concludes summary judgment is proper because no reasonable juror could find Plaintiff faces an individualized risk of serious harm or the environment at TSP is exceedingly violent and violative of the Eighth Amendment. The Court need not address Defendants' arguments regarding qualified immunity.  Plaintiff's request for injunctive relief fails because his substantive claim fails.

### 1.   Legal Standard for Deliberate Indifference to Safety Claim

A prisoner has a constitutional right to be protected from violence and physical assault by other inmates.  <u>Harmon v. Berry</u>, 728 F.2d 1407, 1409 (11th Cir. 1984) (*per curiam*).  However, because "a risk of harm to some degree always exists by the nature of it[] being a [prison]," not every condition rises to the level of an Eighth Amendment violation. <u>Purcell ex rel. Estate of Morgan v. Toombs Cty., Ga.</u>, 400 F.3d 1313, 1323 (11th Cir. 2005); <u>see also</u> <u>Gullatte v. Potts</u>, 654 F.2d 1007, 1012 (5th Cir. Unit B Aug. 1981) ("This does not

mean that the constitutional rights of inmates are violated every time a prisoner is injured.  It would not be reasonable to impose such an absolute and clearly unworkable responsibility on prison officials."); Terry v. Bailey, 376 F. App'x 894, 895 (11th Cir. 2010) (*per curiam*) ("Although 'prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners,' not every instance of inmate on inmate violence 'translates into constitutional liability for prison officials responsible for the victim's safety.'").  "An excessive risk of inmate-on-inmate violence at a jail creates a substantial risk of serious harm; occasional, isolated attacks by one prisoner on another may not constitute cruel and unusual punishment, [but] confinement in a prison where violence and terror reign is actionable." Harrison v. Culliver, 746 F.3d 1288, 1299 (11th Cir. 2014).

"Merely negligent failure to protect an inmate from attack does not justify liability under § 1983." Brown v. Hughes, 894 F.2d 1533, 1537 (11th Cir. 1990) (*per curiam*) (citation omitted).  Stated otherwise, Eighth Amendment liability cannot be based on simple negligence or lack of due care, but rather requires some sort of conscious disregard of a serious and imminent risk. Farmer v. Brennan, 511 U.S. 825 835-39 (1994); see also Adams v. Poag, 61 F.3d 1537, 1543 (11th Cir. 1995) (requiring plaintiff to show "more than mere negligence," and stating courts are to look for "obduracy and wantonness, not inadvertence or error in good faith.").

In particular, a prisoner seeking to impose liability for an Eighth Amendment claim must establish the existence of "(1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation." Lane v. Philbin, 835 F.3d 1302, 1307 (11th Cir. 2016) (internal quotations omitted).  These three elements are evaluated in part by

an objective standard and in part by a subjective standard.  See Caldwell v. Warden, FCI

Talladega, 748 F.3d 1090, 1099 (11th Cir. 2014).

> As the Eleventh Circuit explained,

> When examining the first element—a substantial risk of serious harm—the court uses an objective standard.  The second element—the defendant's deliberate indifference to that risk—has two components:  one subjective and one objective.  To satisfy the subjective component, a plaintiff must produce evidence that the defendant actually (subjectively) kn[ew] that an inmate [faced] a substantial risk of serious harm.  To satisfy the objective component, a plaintiff must produce evidence that the defendant disregard[ed] that known risk by failing to respond to it in an (objectively) reasonable manner.

Id. (internal citations and quotations omitted).  The deliberate indifference prong of the test

requires proof of "(1) subjective knowledge of a risk of serious harm; and (2) disregard of

that risk (3) by conduct that is more than mere negligence."  Dang ex rel. Dang v. Sheriff,

Seminole Cty., Fla., 871 F.3d 1272, 1279 (11th Cir. 2017) (citation omitted).  In addition,

"[a] prison official cannot be found liable under the Eighth Amendment . . . unless the

official knows of and disregards an excessive risk to inmate health or safety; the official must

both be aware of facts from which the inference could be drawn that a substantial risk of

serious harm exists, and he must also draw the inference."  Lane, 835 F.3d at 1308 (quoting

Farmer, 511 U.S. at 837)). Defendants are entitled to summary judgment because Plaintiff

cannot establish the prima facie elements for an Eighth Amendment claim.

### 2. No Reasonable Juror Could Find a Substantial Risk of Serious Harm Because Violence and Terror Do Not Reign at TSP

Applying an objective standard to the first prong of Plaintiff's deliberate indifference

claim, no reasonable juror could find a substantial risk of serious harm based on either an

individualized risk of harm or generalized conditions of dangerousness.  "On substantial risk

of serious harm, 'this objective standard embodies broad and idealistic concepts of dignity, civilized standards, humanity, and decency . . . , but must be balanced against competing penological goals.'" Purcell ex rel. Estate of Morgan, 400 F.3d at 1321 (quoting LaMarca v. Turner, 995 F.2d 1526, 1535 (11th Cir. 1993)). A prisoner has a right "to be reasonably protected from constant threat of violence". Id. (quoting Woodhous v. Virginia, 487 F.2d 889, 890 (4th Cir. 1973). However, a "prison custodian is not the guarantor of a prisoner's safety." Popham v. City of Talladega, 908 F.2d 1561, 1564 (11th Cir. 1990). A plaintiff may establish a substantial risk of serious harm based on the following: (1) an individualized risk; i.e., specific threats directed toward an inmate for reasons personal to him, or (2) generalized conditions of dangerousness. Bugge v. Roberts, 430 F. App'x 753, 758 (11th Cir. 2011) (citing Farmer, 511 U.S. at 843). For the latter, an inmate plaintiff must show they are confined "in a prison where violence and terror reign . . . ." Harrison v. Culliver, 746 F.3d 1288, 1299 (11th Cir. 2014) (quoting Purcell ex rel. Estate of Morgan, 400 F.3d at 1320). On the other hand, "occasional, isolated attacks by one prisoner on another may not constitute cruel and unusual punishment." Id. Because Plaintiff alleges he faced both types of risks at TSP, the Court will address each in turn.

### a.       Plaintiff Does Not Allege an Individualized Risk of Harm

Plaintiff alleges he faced an individualized risk of serious harm at TSP from inmates who attacked him at HSP prior to his transfer to TSP. (Pl.'s Dep., pp. 13-21.) Plaintiff testified he wrote grievances about his concerns, and those grievances were denied by Warden Danforth and Assistant Warden Gammage. (Id. at 18, 117-19, 121-22.) However, Plaintiff admits he was never housed in the same dorm as the inmates he feared and was

"never around them" except during yard call.  (Id. at 19.)  Plaintiff does not indicate the gang members ever threatened him, approached him, or communicated with him in any way. Furthermore, Plaintiff testified the inmates have since been transferred from TSP.  (Id. at 21.) Thus, despite their alleged involvement in inmate-on-inmate violence directed toward Plaintiff at HSP, Plaintiff has failed to allege any facts suggesting he faced an actual, imminent risk of harm from these inmates.  See Baze v. Rees, 553 U.S. at 50 (requiring sufficiently imminent danger).  Accordingly, Plaintiff cannot establish the first element of his deliberate indifference claim based on his concerns of a specific threat from these inmates.

### b. Plaintiff Fails To Allege Generalized Conditions of Dangerousness at TSP

The core of Plaintiff's generalized conditions of dangerousness claim is his allegation that TSP is rife with gang violence to the extent terror and violence reign.  (Doc. no. 166-1.) When viewed in the light most favorable to Plaintiff, the record shows gang violence was not constant at TSP, and non-gang members, like Plaintiff, were not under a constant threat of harm.

From 2015 to his transfer to SSP in November 2018, Plaintiff has personally observed or been involved in only seven gang altercations at TSP.  (Pl.'s Dep., pp. 35-55, 75-76, 102-09, 110-17; doc. nos. 10, 15, 22, 40, 61, 66, 79, 163, 164.)  Even taking as true all of the altercations mentioned in Plaintiff's deposition testimony and declarations, only approximately twenty incidents have occurred in three years in a prison with 1,400 inmates. (See generally Pl.'s Dep.; doc. nos. 10, 15, 22, 38, 40, 61, 66, 79, 99, 163, 164 (alleging attacks at TSP); McCloud Decl., ¶ 4 (estimating number of inmates at TSP).)  Additionally, of all the incidents alleged by Plaintiff, the only mention of gang members preying on non-gang

members is the attack against a civilian inmate in dorm D on March 15, 2016.  (Pl.'s Dep., pp. 73-75.)  Indeed, the incidents of violence against Plaintiff at TSP—being pushed on either March 3 or September 17, 2016, and being hit with the lock on May 10, 2017—were merely accidental and the result of violence taking place around him instead of being directed against him personally.  Based on how few incidents of violence have occurred overall at TSP during the relevant period and the random nature of the minor injuries Plaintiff sustained, the level of violence at TSP is hardly sufficient to be considered a constant threat.

Plaintiff also argues Defendants gave authority to gang leaders to control security and, by doing so, created a constant threat of gang violence.  (Doc. no. 166-1, p. 3.) Defendants each deny promoting gang violence or ever giving gang leaders authority to control inmates.  (Hall Decl., ¶ 31; Danforth Decl., ¶ 27; McCloud Decl., ¶ 27; Gammage Decl., ¶ 24; Kilpatrick Decl., ¶¶ 8-9; Mixon Decl., ¶¶ 8-10; Toole Decl., ¶ 10-11.) Furthermore, the incidents cited by Plaintiff do not show Defendants gave authority to gang leaders to control security and housing at TSP.

First, Plaintiff describes the December 3, 2015 incident, during which Officers Mixon and Kilpatrick escorted two gang members to dorm B-2 and "allowed" them to instruct other gang members to retaliate with violence against other gang members once the lockdown was lifted.  (Doc. no. 164, p. 2; Pl.'s Dep., pp. 25-32.)  However, other than to say the gang leaders told the gang members how to "retaliate" and "handle" the incident, Plaintiff provides no details about what the gang leaders said.  Furthermore, Plaintiff acknowledges the dorm was loud because the inmates were "screaming and hollering" and the leaders did

not speak to him or his cellmate, Trevio Head, at all.  (Pl.'s Dep., pp. 27, 32-33.)  Finally, Mr. Head testified the gang leaders informed other gang members to "quash" their fights and beef with each other.  (Doc. no. 144-4, pp. 2-3.)  Thus, according to Mr. Head, the purpose of Officers Mixon and Kilpatrick bringing the gang members to B-2 was to reduce the risk of violence, not increase it.

Plaintiff states, on January 27 and June 10, 2016, gang members gathered together during yard call and prison officials did nothing to intervene.  (Doc. no. 10, p. 4; Pl.'s Dep., pp. 33-34.)  Although Plaintiff contends such gatherings are prohibited by GDC policy, he does not explain how these events evidence prison officials giving gangs disciplinary authority or increased the risk of violence at TSP, and he does not allege any incidents of violence caused by these meetings.

Plaintiff also states, on March 5 and August 4, 2016, gang members moved members of rival gangs out of their dorm.  (Doc. no. 15, p. 2; Pl.'s Dep., pp. 55-62.)  However, Plaintiff witnessed these incidents from his dorm and does not have firsthand knowledge of what occurred, including whether gang leaders were actually responsible for the inmates being moved.  (Pl.'s Dep., pp. 55-56.)  Indeed, Plaintiff testified prison officials were present and responsible for moving the inmates on each occasion.   (Id. at 56, 60-62, 104.)  Furthermore, regarding the August 4, 2016 incident when Mexican inmates where moved from dorms G and H, Plaintiff faults prison administration for not protecting him in a similar manner by moving him to another dorm.  (Doc. no. 15, p. 5.)  Thus, Plaintiff concedes prison officials were responsible for the movement of these inmates and the purpose of the movement was to protect the inmates and mitigate the risk of violence.

Plaintiff also claims, on August 8, 2016, three prison officials brought gang members to B-2, where they instructed other members of the Blood Gang all Mexican inmates would have to leave TSP following a stabbing on August 3, 2016.  (Doc. no. 14; Pl.'s Dep., pp. 81-84.)  However, Plaintiff testified the Mexican inmates were not transferred or otherwise removed from TSP; instead, TSP administration moved the Mexican inmates from dorms G and H on August 4, 2016, and temporarily housed them in the gym.  (Pl.'s Dep., pp. 85-86.) Thus, although the gang members made statements indicating they had authority to control removal of other inmates from TSP during the August 8th incident, Plaintiff's testimony indicates they did not, in fact, have such authority, as the Mexican inmates were not removed from TSP. In fact, as described above, TSP administrators had already moved the Mexican inmates out of dorms G and H for their safety.

Next, Plaintiff claims Unit Manager McCloud and Warden Hall gave a speech in dorm B-2 on March 9, 2016, giving supervisory authority to inmates.  However, Plaintiff's own testimony about Warden Hall's statements indicates the purpose of the speech was to stop violence attributable to gang members and facilitate communication between inmates and prison officials.  Plaintiff testified Warden Hall stated they put leaders in the dorms so, if there is a problem in the dorm "they'll come to us and notify us and let us know what [is] going on."  (Pl.'s Dep., pp. 65.)  Thus, Plaintiff's testimony undermines his claim prison officials gave inmates authority over other inmates.  Indeed, Plaintiff testified the "leaders" in the dorms were responsible for communicating concerns between prison officials and inmates.  Plaintiff's testimony about the March 3, 2016 incident is consistent therewith. Plaintiff testified the "leader" in B-2 was responsible for "helping Telfair interact with gang

members" and tried to stop the stabbing between inmates from occurring that day.  (Id. at 36-37.)  Thus, Plaintiff's claim Warden Hall and Unit Manager McCloud put gang members in place as leaders to exert disciplinary authority is contradicted by his own testimony.

Plaintiff claims Director Toole admitted complicity in allowing gang members to have authority at TSP during an August 3, 2016 speech.  (Doc. no. 15, p. 2.)  Again, Plaintiff's testimony about Director Toole's actual statements during the speech undermines his claim.  Plaintiff testified Director Toole stated, "[Y]ou all can't do that no more . . . . You can't be on your own any more.  You can't gangbang no more. . . . You got to find another way to do this."  (Id. at 103.)  Director Toole stated in his declaration he is generally aware gangs exist throughout GDC's prisons.  (Toole Decl., ¶ 9.)  Thus, his alleged statements during the August 3rd speech are consistent with his knowledge of the presence of gang members in all prisons, and does not indicate he was aware of or responsible for giving gang members authority over other inmates at TSP.

Finally, on December 12, 2016, gang members told Plaintiff they wanted his cell and he moved to another cell while prison officials watched.  (Doc. no. 39, p. 1; doc. no. 40, p. 2.)  However, Plaintiff does not indicate the gang members threatened him in any way or used coercive means to move Plaintiff.  Furthermore, Plaintiff testified officers do not require inmates to remain housed in their assigned rooms and inmates "handle it on our own."  (Pl.'s Dep., pp. 44-46.)  In fact, when Plaintiff was transferred to dorm B-2, there was another inmate in his assigned cell, so he moved into the cell with Mr. Head.  (Id.)  Inmates' cells within the dorm become assigned to them if they are living in the cell when a roster change is performed.  (Id.)  Thus, Plaintiff's allegation does not show the inmates relied on

authority granted to them by prison officials or exerted influence through any threats of violence. The mere fact prison officials watched him move proves nothing.

In addition to his testimony and declarations, Plaintiff also submitted the declarations of Jason Castro and Trevio Head to support his claims. First, the sworn declaration of Trevio Head is entirely unhelpful because it merely lists a series of dates he allegedly witnessed unspecified "claims" of "assaults by gang members." (Head Decl., doc. no. 4.) Second, Mr. Castro declares Warden Hall and Unit Manager McCloud gave him supervisory authority of inmates in dorm A-1, where Plaintiff resided from September 2018 through his transfer in November 2018. (Doc. no. 123.) Mr. Castro states Warden Hall and Unit Manager McCloud approached him on several occasions about becoming a "leader" to oversee gang members and met with him after the death of Daniel Martinez. (Id.) Mr. Castro states Unit Manager McCloud asked him after the meeting if he has control over his people. (Id. at 2.) Mr. Castro states these discussions placed him in danger of violence from gang members, who consider him an informant for prison officials. (Id.) However, Mr. Castro never claims he is a gang member and gives no indication his role as a leader involved anything more than attempting to prevent violence, such as the death of Mr. Martinez, and providing information to prison officials.

In sum, the incidents cited by Plaintiff and Mr. Castro's declaration do not support Plaintiff's contention gang members were given supervisory, disciplinary, and classification authority over other inmates at TSP by Defendants or that such authority created a substantial risk of serious harm to Plaintiff.

Further, as detailed in § I.B, <u>supra</u>, the undisputed housing and security measures implemented by GDC and TSP negate Plaintiff's contention Defendants have created "generalized conditions of dangerousness" at TSP.  As a close security prison, TSP must house violent inmates with gang affiliations, and TSP distributes gang members across the prison population to decrease the risk of gang violence.  (Hall Decl., ¶¶ 7, 10.)

At TSP, inmates must pass through metal detectors during chow and yard time, inmates' cells are searched for contraband in shakedowns, officials conduct meetings to discuss security issues and write disciplinary reports when there are inmate assaults, and procedures to punish violent inmates are in place.  (<u>Id.</u> at ¶¶ 17, 20-23, 26; Pl.'s Dep., pp. 59, 65-66, 78-81, 134-35.)  If a widespread altercation does occur, prison officials have authority to place individual dorms in lockdown to diffuse the situation.  (Hall Decl., ¶ 27.)  Although Plaintiff disputes the effectiveness of these security measures, he does not dispute they were in place at TSP while he was housed there.  (Doc. no. 166-1, pp. 1, 15-19.)  Furthermore, Plaintiff admits TSP was in lockdown after gang violence broke out in December 2015, March 2016, and May 2017, and shakedowns occur regularly.  (Pl.'s Dep., pp. 25-29, 62-63, 72-73, 102.)

Most importantly, the fact Plaintiff has never been the target of any gang-related altercation while at TSP shows violence does not reign and TSP's security measures are effective in creating an objectively safe environment both generally and with respect to Plaintiff.  At most, Plaintiff has proved he is fearful of an attack and has suffered minor injuries on two occasions as an indirect result of altercations between other inmates, which is not by itself sufficient to constitute imminent danger.  See <u>Baze v. Rees</u>, 553 U.S. 35, 50 (2008) (quoting <u>Helling v. McKinney</u>, 509 U.S. 25, 33, 34–35 (1993)) (stating for Eighth amendment claims, "the

24

conditions presenting the risk must be 'sure or very likely to cause serious illness and needless suffering,' and give rise to 'sufficiently imminent dangers'"). By their nature, all prisons have some degree of risk. (Hall Decl., ¶ 17); see Purcell ex rel. Estate of Morgan, 400 F.3d at 1323 (citing Wilson v. Seiter, 501 U.S. 294, 298 (1991) (describing inherent risk in jail setting). Because no reasonable juror could find unreasonably dangerous risk levels at TSP, either generally or with respect to Plaintiff, there is no objectively substantial risk of serious harm at TSP.

Close examination of controlling precedent leaves no doubt of this conclusion. In Purcell, the plaintiff alleged jail conditions caused her son's beating and subsequent death while detained. 400 F.3d at 1316. The Eleventh Circuit affirmed summary judgment for the defense because: (1) prison officials segregated inmates based on crimes committed and potential for conflict with other inmates; (2) prison officials punished inmates for violence; and (3) serious inmate-on-inmate violence was not even close to something of the norm. Id. at 1321-23. In Harrison, the Eleventh Circuit held thirty-three attacks over three years in a prison housing between 830-990 inmates was "hardly sufficient to demonstrate . . . a prison 'where violence and terror reign.'" 746 F.3d at 1299-1300 (quoting Purcell ex rel. Estate of Morgan, 400 F.3d at 1320). Here, TSP has adopted safety protocols similar to those in Purcell, and TSP houses more inmates than in Harrison, but had less violence over the roughly the same period of time, undoubtedly because of the rigorous safety measures by GDC and TSP.

Conversely, in cases where an objectively substantial risk of serious harm existed, there were numerous hazardous conditions, none of which are present here. In Marsh v.

25

Butler County, 268 F.3d 1014, 1029 (11th Cir. 2001) (en banc), *abrogated on other grounds by* Bell Atl. Corp. v. Twombly, 550 U.S. 544, 561-63 (2007), conditions creating a risk of serious injury included no segregation of different types of inmates, overcrowding, faulty cell locks allowing freedom of movement for inmates, no lockdowns of prisoners at any point in the day, no inmate screening, no disciplinary procedure, and no visual inspection of cells. Also, in Hale v. Tallapoosa Cty., 50 F.3d 1579, 1581-84 (11th Cir. 1995), a prisoner plaintiff's claims survived summary judgment because the prison did not segregate inmates by proclivity for violence, only one jailer was on duty at certain times in the day, prisoners' cells could not be seen or heard from the guards' quarters, and fights resulting in injuries requiring medical attention were constant.  Id.

Further, Purcell, Harrison, Marsh and Hale all concerned a prisoner who was targeted by other inmates and physically beaten and injured as a result of the violent conditions.  See Harrison, 746 F.3d at 1294 (alleging inmates cut plaintiff's throat with box-cutter while standing in line); Purcell ex rel. Estate of Morgan, 400 F.3d at 1316-17, n.8 (alleging assault by three inmates resulting in coma and permanent mental impairment); Marsh, 268 F.3d at 1029 (alleging assault by four inmates resulting in lacerations and broken bones); Hale, 50 F.3d at 1581 (alleging prisoner beaten by two inmates without provocation).  Here, Plaintiff's injuries have been minimal and incidental to violence between other inmates, and Plaintiff has not alleged he was the intended target of violence by gang members.  While regrettable, "an isolated mishap alone does not give rise to an Eight Amendment violation . . . ."  Baze, 553 U.S. at 50.  Accordingly, no reasonable juror could find Plaintiff faced a substantial risk of serious harm based on either a specific threat or generalized conditions of dangerousness.

### 3. No Reasonable Juror Could Find Defendants were Deliberately Indifferent to Any Substantial Risk of Serious Harm

As to the second prong, the undisputed facts show Defendants neither subjectively knew Plaintiff faced a substantial risk of serious harm, nor disregarded that known risk by failing to respond to it in an objectively reasonable manner.  See Lane, 835 F.3d at 1307; Caldwell, 748 F.3d at 1099.  First, there is no evidence Defendants were actually aware Plaintiff faced a substantial risk of serious harm related to gang violence while at TSP. Defendants deny knowledge of gang violence being a constant threat and gang leaders being given authority over prison security.  (Hall Decl., ¶¶ 31-34; Danforth Decl., ¶¶ 27, 29; Gammage Decl., ¶¶ 24, 26; McCloud., ¶¶ 27, 29; Mixon Decl., ¶ 8; Kilpatrick Decl., ¶¶ 8-11.)  Plaintiff does not indicate he ever talked to any of the Defendants about specific threats to his person.  (Pl.'s Dep., pp. 25-32, 116, 117-23.)

Although "[i]nferences from circumstantial evidence . . . can be used to show that a prison official possessed the necessary knowledge," Lane, 835 F.3d at 1308, there is no circumstantial evidence in this case with which to draw such an inference.  All prisons have inmate violence and as well as gangs.  (Toole Decl., ¶ 9; Hall Decl., ¶¶ 9, 17.)  However, violence at TSP was not occurring at an excessive or unreasonable rate between January 2015 and February 2016, and both gang-related and overall violence decreased during Warden Hall's tenure as warden from January 2016 through July 2018.  (Kilpatrick Decl., ¶ 11; Hall Decl., ¶ 34.)  Additionally, every Defendant denies knowledge of, or participation in, ceding authority of prison security to gang leaders because it would be counterproductive to prison safety.  (Hall Decl., ¶ 31; Danforth Decl., ¶ 27; McCloud Decl., ¶ 27; Gammage

Decl., ¶ 24; Kilpatrick Decl., ¶¶ 8-9; Mixon Decl., ¶¶ 8-10; Toole Decl., ¶ 10-11.)  The only evidence Plaintiff cites to the contrary is inadequate to create a genuine issue of material fact, as explained above.  See supra § II.C.2.

Looking to each Defendant individually, Director Toole did not work at TSP and only visited Plaintiff's dorm at TSP once during the events involved in this case.  (Pl.'s Dep., p. 104-05.)  On that visit in August 2016, Plaintiff alleges Director Toole gave a speech to one of the dormitories soon after a lockdown acknowledging and admonishing recent gang violence.  (Id. at 102-103.)  Plaintiff only sued him because of this speech.  (Id. at 120-21.) As to Warden Danforth and Deputy Warden Gammage, Plaintiff admits he never had conversations with them about the problems he perceived with gangs at the prison.  (Id. at 117-118, 121-122.)  Plaintiff only sued these Defendants because they denied his grievances concerning being housed with members of the gang that assaulted him at HSP.  (Id.) However, as explained above, Plaintiff does not allege facts sufficient to show a substantial risk of serious harm based on these concerns, and, thus Defendants could not have been deliberately indifferent based on this concern.

Lastly, Plaintiff did not personally speak with Officers McCloud, Mixon, Kilpatrick, and Hall about any substantial risk of serious harm to him personally from gang violence. (Id. at 25-32, 116, 122-23.)  Plaintiff does not allege any communications with Officers Mixon and Kilpatrick and only sued them because they escorted two gang members to dorm B-2 on December 3, 2015.  (Id. at 25-32, 122-23.)  Plaintiff states he wrote letters to both Deputy Warden McCloud and Warden Hall and Warden Hall denied his March 3, 2016 grievance concerning his allegations of generalized conditions of danger.  (Id. at 116, 122-

23.)  Furthermore, Plaintiff states he met with GDC Chairman Bruce Chapman in June 2017 to discuss his dorm and prison assignment and Warden Hall was present at the meeting.  (Id. at 92-96.)   However, Plaintiff's grievance and the June 2017 meeting only concerned Plaintiff's generalized fear of gang activity and questions over his living situation.  (Id. at 92-96, 122-23.)  As stated above, generalized awareness of risks is not enough, and Plaintiff never communicated any specific threats to Defendants.  See Carter v. Galloway, 352 F.3d 1346, 1350 (11th Cir. 2003) (finding no subjective awareness of risk where prison officials only possessed general awareness of plaintiff's attacker being problematic inmate). However, even if Plaintiff adequately communicated his concerns to Defendants, Plaintiff would still fail to state a claim because, as described above, Plaintiff did not face a substantial risk of serious harm based on his allegations of generalized conditions of dangerousness.

Second, Plaintiff cannot establish Defendants disregarded a known risk in an objectively unreasonable manner.  Plaintiff discusses at multiple times in his depositions, as well as in his filings, the security measures taken when violence occurred.  (Pl.'s Dep., pp. 25-29, 62-63, 72-73, 102; doc. nos. 10, 14, 15, 43, 66.)  From late 2015 until Plaintiff's deposition, TSP implemented lockdowns when necessary, gave speeches admonishing gang violence, and conducted regular shakedowns.  (Pl.'s Dep., pp. 25-29, 62-65, 72-73, 102.)  TSP has many security measures ranging from security checkpoints with metal detectors, segregated buildings and dorms, and disciplinary procedures for unruly inmates.  (Hall Decl., ¶¶ 19-28.)  Thus, Defendants were not deliberately indifferent to Plaintiff's safety.

### 4.     Plaintiff Fails to Prove Causation Because Defendants Were Not Deliberately Indifferent

As to the third prong of an Eighth Amendment claim, the record shows Plaintiff cannot establish causation because Plaintiff was not exposed to a substantial risk of serious harm and Defendants were not deliberately indifferent to his safety.  See Melton v. Abston, 841 F.3d 1207, 1220 (11th Cir. 2016) (requiring causal connection between Plaintiff's harm and defendant's deliberate indifference).  Plaintiff has only been able to establish he was fearful of a possible attack from gang members at TSP and, on two occasions, was the victim of random harm during physical violence among other inmates.  This is not enough.  See Baze v. Rees, 553 U.S. at 50 (requiring sufficiently imminent danger).  In sum, no reasonable juror could find in favor of Plaintiff with respect to any of the three elements of his Eighth Amendment failure to protect claim.

## III.    EQUAL PROTECTION CLAIM

In his response to Defendants' motion for summary judgment, Plaintiff attempts to raise an Equal Protection claim.  (Doc. no. 166-1, pp. 1-2.)  Plaintiff argues inmate victims of sexual harassment are protected by the Prison Rape Elimination Act, but there is no similar protection for inmates at risk of gang violence.  (Id.)  This claim has never been part of this lawsuit.  Accordingly, Plaintiff's attempt to raise the claim at this stage is improper and will receive no consideration by the Court.

## IV.    CONCLUSION

For the reasons set forth above, the Court **REPORTS** and **RECOMMENDS**, Defendants' motion for summary judgment be **GRANTED**, (doc. no. 144), a final judgment

be **ENTERED** in favor of Defendants, and this civil action be **CLOSED**.

SO REPORTED and RECOMMENDED this 27th day of June, 2019, at Augusta, Georgia.

BRIAN K. EPPS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA